*Bayard* for plaintiff. *Johns* [for] defendant.

### WRIGHT'S LESSEE v. CANNON.

High Court of Errors and Appeals. August, 1795.

*Bayard's Notebook, 98.**

* This case is also reported in *Wilson's Red Book, 240; Rodney's Notes,* Aug., 1796.

Present:  KILLEN, Chancellor, READ, Chief Justice of Supreme Court, BASSETT, Chief Justice [of the] Common Pleas (he had not sat in court below), ROBINSON and CLAYTON, Associate Judges of Supreme Court.

Before this Court it was argued by *Peery, Miller,* and *Wilson* for plaintiff, and *Ridgely* and *Bayard* for defendants.

The counsel for the plaintiff contended that the judgment obtained by the plaintiff in 1782 against the administrators of Hubbard, and under which he deduced a title, was a lien upon the lands of the intestate, and that the subsequent proceedings in the court and the sale made by the sheriff to the plaintiff all related to the date of the judgment and, of consequence, by relation carried back the title of the plaintiff to that time. That it followed as a consequence where lands were liable to be sold on a judgment that the judgment was a lien from the time it was rendered, 2 Bac.Abr. 362, 8 Co. 340, *Sir Gerard Fleetwood's Case.* That by an Act of Assembly among the laws of Pennsylvania passed during the union of the province and territories, lands in the hands of executors and administrators upon judgments against the executors and administrators were liable to be sold upon execution. That accordingly since the year 1700, when the Act was passed, it had been the practice to sell lands upon judgments against executors and administrators. That the Act of this state which subjected lands to sale for debts was general and extended to cases like the present, as well as to debts due from parties in their own rights. That in the preamble to the Act for the better confirmation of the owners, etc., 1 Body Laws [49], it is recited that lands had been considered and taken and sold for payment of debts as chattels. And in a supplement to the same Act, [1] Del.Laws [138], it is recited that it had been usual for executors to have the lands appraised and account for the value. By the laws and usages of the state it was therefore evident that the lands were considered as vested in the executors and administrators for the payment of debts and consequently were affected by the judgments against them. That the *fieri facias* which issued was framed upon this principle. It directed the sheriff of the goods and chattels, lands and tenements to levy the debt. That an Act of Assembly lately passed, [2] Del.Laws

[1070], indirectly affirmed this practice by providing that judgments against executors and administrators in certain cases should be no lien upon lands, which clearly implied that such judgments antecedently were liens. That the practice in Pennsylvania upon laws nearly the same as those of the state was to sell lands upon judgments against executors, [1] Dall. 131–132 and 481. That the lien of the judgment was complete without an execution, 2 Atk. 441. That if the judgments were considered as a lien, there could be little doubt of the title relating to the time of the judgment according to the principle established by the opinion of the court in 5 Burr. 2785. And the Court of Common Pleas having undoubted jurisdiction in the case, the subsequent proceedings in the Orphans' Court could not impair the validity or lessen the effect of the judgment which had been rendered before those proceedings were instituted. Considering their title as relating to the time of their judgment and that judgment could not be affected by the subsequent proceedings in the Orphans' Court, it followed that the plaintiff's title to the lands in question took place of that under which the defendants claimed.

For the defendants it was argued that though the practice certainly had been to consider judgments against executors and administrators as liens, yet the authority of the practice was still questionable. The laws had expressly authorized executors and administrators under powers from the Orphans' Court to sell lands; but that it was matter of very doubtful inference, the right to sell upon judgments against them. The Act of Pennsylvania of 1700 could not be considered as the law of this state. It was not found among our laws, and the statute book of Pennsylvania could be no proof of the Laws of Delaware. Many laws had existed not contained in our statute book. They had been repealed or become obsolete from non-user. It would be possible from ancient editions of the laws to show acts not now in force, but where no memorials could be found to evidence their repeal. The statute book had always been considered as containing the body of the legislative acts in force; and it would be dangerous to go beyond it; as the persons as well as property of the citizens might be made dependent on laws which it would require the diligence of an antiquarian to have any knowledge of. That the Act of Assembly for taking lands in execution for the payment of debts plainly referred to debts due from persons in their own right and owners of land in their proper right, and that there was no ground to say that the general words extended to debts due in *auter droit* and to lands the title to which was not vested in the party against whom the judgment was obtained. That the recitals in the acts for the confirmation of the owners, etc., and

the supplement, when combined with the intention of the enacting clause, rather showed that the practice recited was irregular and required the confirmation of a law to give it validity. That the provisions of those laws were retrospective and had no operation upon the present case. That the late Act of Assembly [2 Del.Laws 1070] declaring that judgments against executors should not be liens in certain cases alluded to a practice admitted to exist. It abolished the practice in part but established it in no point. The question then was whether mere practice, where no legitimate origin could be shown, was sufficient to establish a rule of the first magnitude as to real property. It was agreed that practice was good authority as to the forms of proceedings, but it was submitted that a usage certainly within legal memory, may, clearly of no ancient standing, could not be allowed the effect of abrogating the common law and introducing a principle repugnant in its nature to the system with which it was connected. An executor of his own will could not sell the lands without an order of the Orphans' Court, and yet upon a judgment against him the lands might be sold without his will and without an order of the court. By this an executor colluding with a creditor could do that circuitously which he could not do directly, which was against a maxim of the law. That if the executors did not take the lands, it would be absurd to say a judgment against them could be a lien upon the property vested in another. That doctrine so incongruous formed no part of the law. That if the executor took the lands as chattels, as had been intimated, then the judgment would be no lien; for a judgment against an executor is not a lien upon real chattels, not even in a term for 1000 years. And in no case is a judgment a lien upon a chattel—so is the *Case of Sir Gerard Fleetwood,* 8 Co. 340. To give consistency, therefore, to the law as contended for, the executor must not only take the freehold but the inheritance, because the inheritance is liable to be sold upon a judgment against him.

But it was further insisted that, though the judgment was a lien, it was liable to be discharged by a sale of the land under an order of the Orphans' Court. It was the duty of the executor to pay all the debts of the testator, those due by judgment as well as by contract. That for this purpose, when the personal fund was exhausted and it was made to appear to the Orphans' Court by a list of all the debts returned that the debts could not be paid without the aid of the land, a power was given to the court to authorize the sale of the lands. The debts returned might be judgments alone, and the authority might be given to sell lands to pay those very judgments; and could it be said that when the law entrusted the executor to receive money from the purchaser upon

the sale of land for the payment of a certain debt, that after the purchaser had paid his money, if it was misapplied, that he should still be liable to the demand of the creditor to whose use he had advanced money to the amount of his debt to a person entrusted by law to receive it. That the principle upon this subject was different in all other cases. If a sheriff levy upon goods to the value of £100 for a debt of £50 and sell to the amount of the debt, the lien of the execution is surely discharged in respect of the other goods. So where lands are charged with the payment of taxes, the receipt of the collector, though the money be misapplied, discharges the lien. If an executor can have a power to sell lands in order to pay a judgment debt, and he sells accordingly and receives the money, it must follow upon legal principles that the debt is discharged, and the remedy is against the executor. In this there is no hardship, for the law supposes an executor always able to pay from the security it obliges him to give. And the judgment creditor still preserves an advantage from his lien by the claim it gives him against the executor to payment according to the priority of the lien. The power under which an executor sells is express and absolute. The law has not subjected it to any liens. It was manifestly the intention of the legislature that the executor should make a clear title to the purchaser and be answerable for the application of the money. A single judgment creditor, otherwise, resting on the security of his lien, might prevent or at least greatly embarrass the sale of lands of much greater value than his debt. He might refuse to proceed to sale, and if the executor sold, people might be afraid to purchase lest the money should be misapplied, or if they purchased, they might require a premium for the risk they run by refusing the full value of the land.

The principle of discharging the lien of a judgment without the consent of the judgment creditor by the sale of the executor was not new. It was seen in the common practice, where a sale by the sheriff upon a judgment *puisné* would discharge the lien of a judgment *cigné,* even where no process upon such judgment had come to the hands of the sheriff. It could not be said that there was any collision between the jurisdictions of the courts of common law and Orphans' Court. The proceedings of both courts tended to the same object—the payment of the debts according to their dignity and priority. If there had been several judgments against an executor, a sale made by the sheriff upon the youngest would discharge the older. And the power of an executor under the authority of the Orphans' Court was quite as plenary, and the security of the creditors whose liens were discharged quite as ample. It was therefore insisted that the plaintiff failed

in supporting the ground on which he rested his title. The lien of the judgment being discharged by the sale of the administrators, the plaintiff could not support his title by relation, and without such relation could be maintained, the defendants had an undoubted title under the sale of the administrators.

---

After the argument the Court took some days to consider the case, and during the term their opinion was delivered by KILLEN, President of the Court; that the judgment of the court below should be reversed, and the plaintiff have judgment for the recovery of his term. The President did not enter into the reasons upon which the opinion of the Court was founded, though READ, Chief Justice [of the] Supreme Court, intimated that they considered the judgment as a lien and not discharged by the sale of the administrators.

NOTE. BASSETT, Chief Justice of the Common Pleas, differed in opinion from the Court and was of opinion that the judgment below ought to have been affirmed.